# IN THE DISTRICT COURT OF GUAM
## TERRITORY OF GUAM
## CRIMINAL MINUTES
## GENERAL

CASE NO.: CR-07-00078                    DATE: October 11, 2007

---

HON. JOAQUIN V. E. MANIBUSAN, JR., Magistrate Judge, Presiding
Law Clerk: Judith P. Hattori                    Court Reporter: Wanda Miles
Courtroom Deputy: Leilani Toves Hernandez        Electronically Recorded: 2:04:32 - 2:40:30
CSO: N. Edrosa

---

**APPEARANCES:**

Defendant: Juan C. Tenorio and                    Attorney: Howard Trapp
           Charlene F. Tenorio

   Present    Custody    Bond    P.R.              Present    Retained    FPD    CJA

U.S. Attorney: Jeffrey Strand                     U.S. Agent:
U.S. Probation: None Present                      U.S. Marshal: None Present
Interpreter:                                      Language:

---

**PROCEEDINGS: Motion for Fed.R.Crim.P 44(c) Inquiry About the Propriety of Joint Representation**

- Court examined both defendants and Mr. Trapp.
- Defense Exhibit AA submitted to the Court.
- The Court ruled that there is no inpropriety of joint representation by Mr. Trapp.
- Pretrial Conference before Chief Judge Tydingco-Gatewood set for: <u>10/12/2007 at 1:30 p.m.</u>

NOTES:

UNITED STATES of America,
Plaintiff–Appellee,

v.

Valerie LIGHTBOURNE, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jon LIGHTBOURNE, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard LIGHTBOURNE,
Defendant–Appellant.

Nos. 96–30002, 96–30003, 96–30012.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 13, 1996.

Decided Jan. 16, 1997.

Defendants were convicted of conspiracy
to manufacture and distribute methamphet-
amine by the United States District Court
for the Western District of Washington, Jack
E. Tanner, J., and they appealed. The Court
of Appeals, Noonan, Circuit Judge, held that:
(1) probable cause existed for issuance of
warrant to search suspected drug conspira-
tors' home; (2) conspirators were not denied
effective assistance of counsel by joint repre-
sentation; (3) conspirator was properly
charged, for sentencing purposes, with
amount of drugs that could have been pro-
duced by chemicals found in conspirators'
van lab; and (4) trial judge's comment would
not support vindictive prosecution claim.

Affirmed.

**1. Drugs and Narcotics ⬅188(2)**

Probable cause existed for issuance of
warrant to search suspected drug suppliers'
home based on testimony of third party from
whom undercover officer purchased drugs

that he had obtained drugs from suppliers, as
corroborated by other information police had
received regarding suppliers and by third
party's own actions in traveling to suppliers'
home after he had received marked buy mon-
ey and in returning, approximately one-half
hour later, with drugs. U.S.C.A. Const.
Amend. 4.

**2. Drugs and Narcotics ⬅188(2)**

Probable cause existed for issuance of
warrant to search residence which drug con-
spirator had twice visited after he received
marked buy money from undercover officer
and before he returned with drugs, in light of
tips which police officers had already re-
ceived about owner of residence, and given
evidence that party identified as supplier of
drugs also met with conspirator at residence;
on short, fast mission to complete drug deal,
it was probable that conspirator would twice
stop only for business at hand. U.S.C.A.
Const.Amend. 4.

**3. Criminal Law ⬅394.4(6)**

Evidence which police officers seized
during warranted search of suspected drug
conspirator's residence was admissible, even
assuming that issuing magistrate erred in
determining that there was probable cause
for issuance of warrant, where officers had in
good faith relied on warrant which was not
deficient on its face and which was prepared
with assistance of county prosecutor and
chief criminal deputy prosecutor of county.
U.S.C.A. Const.Amend. 4.

**4. Criminal Law ⬅1119(1)**

While claim of ineffective assistance is
typically decided on petition for habeas cor-
pus, Court of Appeals could hear claim on
direct appeal, where record was sufficiently
complete to allow Court to decide issue.
U.S.C.A. Const.Amend. 6.

**5. Criminal Law ⬅641.5(2.1)**

District court has substantial latitude in
deciding whether to permit joint representa-
tion of multiple defendants by single attor-
ney. U.S.C.A. Const.Amend. 6.

**6. Criminal Law ⬅641.5(3)**

Husband and wife, each of whom was
charged with participating in conspiracy to

manufacture and distribute methamphet-
amine, were not denied effective assistance of
counsel merely because district court, after
advising them of risks of not obtaining sepa-
rate legal counsel, allowed them to proceed
with joint legal representation by same attor-
ney who had successfully defended related
state charges against them; even at sentenc-
ing, after wife had obtained her own attor-
ney, she could produce no facts lessening her
culpability in conspiracy. U.S.C.A. Const.
Amend. 6.

**7. Criminal Law ⊜1208.6(2)**

Sentence imposed on convicted drug
conspirator was properly enhanced based on
presence of pistol on headboard of her bed
ready for use to defend drugs of conspira-
tors, notwithstanding her contention that she
did not own pistol and that pistol wasn't
foreseeable to her.

**8. Conspiracy ⊜51**

Convicted drug conspirator was properly
charged, for sentencing purposes, with
amount of drugs that could have been pro-
duced by chemicals found in conspirators'
van lab, where conspirator was equal partici-
pant in conspiracy, whose participation was
not limited as to time.

**9. Criminal Law ⊜37.15(2)**

Trial judge's comment, that drug defen-
dants might have escaped any criminal pros-
ecution altogether if they had not been so
persistent in bringing action to obtain return
of property seized during warranted search,
was not sufficient to support vindictive prose-
cution claim, but was mere comment on the
fact that, by refusing to let matter sleep
following dismissal of related state charges
against them, defendants may have eventual-
ly stirred federal prosecutor to action.

Peggy Sue Juergens, Seattle, Washington,
for defendant-appellant Valerie Lightbourne.

Robert H. Gombiner, Assistant Federal
Public Defender, Tacoma, Washington, for
defendant-appellant Jon Lightbourne.

Keith A. MacFie, Daly and MacFie, Taco-
ma, Washington, for defendant-appellant
Richard Lightbourne.

Douglas B. Whalley, Assistant United
States Attorney, Seattle, Washington, for the
plaintiff-appellee.

Appeals from the United States District
Court for the Western District of Washing-
ton, Jack E. Tanner, District Judge, Presid-
ing, D.C. Nos. CR-95-05100-2-JET, CR-95-
05100-3-JET, CR-95-05100-1-JET.

Before: NOONAN, THOMPSON and
KLEINFELD, Circuit Judges.

## OPINION

NOONAN, Circuit Judge:

In these consolidated cases Jon Lightb-
ourne (Jon), Richard Lightbourne (Richard)
and Valerie Lightbourne (Valerie) appeal
their convictions of conspiracy to manufac-
ture and distribute N, N-dimethylampheta-
mine in violation of 21 U.S.C. §§ 841(a)(1)
and 846. All three defendants challenge the
sufficiency of the search warrant underlying
the discovery of their conspiracy. Richard
and Valerie, who are husband and wife, ar-
gue that while they chose to have a single
lawyer represent them at trial, their inter-
ests were in conflict and they should have
had different counsel. Valerie challenges her
sentence which is based on all drugs attribut-
able to the conspiracy and enhanced by the
presence of a firearm on the headboard of
her bed.

Holding that the search warrant was based
on an adequate showing of probable cause,
that husband and wife freely and knowingly
waived any conflict of interest on the part of
their counsel, and that Valerie was responsi-
ble for all the drugs and for the gun, we
affirm the judgment of the district court.

## FACTS

On September 27, 1990 Deputy Sheriff
Kenneth D. Sukert sought the assistance of
the appropriate county attorneys to prepare,
and then file, an affidavit in support of a
search warrant. We summarize its contents:

Deputy Jerry Baker of the Oak Harbor
Police Department had made controlled
buys of methamphetamine (meth) on Au-

gust 20, August 31, and September 6, 1990 from Joseph S. Trujillo. Trujillo stated that he was employed by Richard Lightbourne, the owner and operator of Ludlow Lawn Care and Landscaping Company in Port Ludlow, Jefferson County. Baker asked Trujillo if he needed front money to obtain the drugs. Trujillo said no because he was employed by those who supplied him with them.

On September 24, 1990, Deputy Sukert arranged for Deputy Baker to make a buy at the Port Townsend ferry terminal from Trujillo. Wearing a body wire with a transmitter Baker met Trujillo and discussed the deal. Trujillo then drove Baker to a gas station to get gas and then took him to the house where Trujillo lived with his girlfriend and her children. Trujillo now said he needed cash up front. Baker gave him eight $100s. These bills were marked. Trujillo reached under a nightstand and removed four or five $50s to supplement this sum which it was agreed would go for the purchase of one ounce of meth. The price was to be $1,250. Baker agreed to hand over $450 more on delivery. In Trujillo's bedroom Baker observed three different scales and a small silver pipe he knew could be used to ingest drugs. Trujillo told Baker that he had to meet a guy who would take the money to get the dope from another guy. Trujillo identified the recipient of the money as a relative of the source of the drugs. He said he'd be back in fifteen minutes.

Leaving Baker at his home, Trujillo then re-entered his gold Matador and drove into a private drive at 3320 Oak Bay Road. Surveillance officers led by Deputy Peter Piccini observed him and also observed a brownish 1970 Chevrolet they believed driven by Jon or Richard Lightbourne on the way to 3320 Oak Bay Road. (They later confirmed that the car was registered to Jon at 450 Sentinel Firs Road.) The car was soon parked at the Oak Bay address, which the officers knew from a prior burglary investigation to be the home of Marlene Nowak. The officers observed her speaking to Trujillo in front of the house.

Trujillo then drove the gold Matador south from 3320 Oak Bay Road and turned

on to Sentinel Firs Road, a street half a mile long ending in a cul-de-sac. Deputy Piccini, following Trujillo, stopped half way down the street. A confidential informant (CI) was positioned near the Lightbourne residence at 450 Sentinel Firs Road and had earlier been enlisted in the investigation. The CI was a former security guard with no criminal history. He was familiar with Richard and Valerie Lightbourne. From fear for his safety he did not wish to be identified. The CI saw the driver of the gold Matador come from the house accompanied by Valerie. He saw Richard working on a flatbed truck. Earlier he had seen Jon drive from 450 Sentinel Firs Road.

Trujillo drove the Matador back to 3320 Oak Bay Road and was again observed there by the deputies as he talked to Marlene Nowak in front of her house. Trujillo then drove back to where he had left Baker. He had taken half an hour for his trip. He delivered two plastic bags of a yellow crystalline substance similar to what he had previously sold Baker. Trujillo weighed the bags to assure Baker of the quantity. Baker delivered the $450. He took the bags back to the sheriff's office where his purchase tested positive for meth.

In addition, the sheriff's office had information not in itself reliable enough to support a warrant: On April 18, 1990 Shawn Beggio, suspected of child molestation, told Deputy Randal Kelly that he bought crack and pot from a guy named John whose nickname was Sparky and who drove a brownish Chevrolet. Deputy Sukert knew that Jon Lightbourne went by the nickname Sparky. On September 21, 1989 Vernon Fossum, a felon involved in a custody dispute with his wife, told Deputy Kelly that his wife Kathy was using meth that she bought from Marlene Nowak, that Jon Lightbourne manufactured the meth, and that Richard Lightbourne delivered it.

Deputy Sukert had been a police officer for twelve years and had been involved in numerous drug arrests. It was his experience that persons selling large amounts of drugs often used other residences or per-

sons as go-betweens. Deputy Baker had been an officer for eight years and Deputy Piccini for nine; both had been involved in numerous drug investigations and arrests.

On the basis of this affidavit a district court judge for Jefferson County found "probable cause to believe that the crime(s) of manufacture, delivery and/or possession of controlled substance" had been committed in violation of RCW 69.50 and that evidence of that crime or contraband or the fruits of the crime or weapons would be found at 450 Sentinel Firs Road. The search warrant was executed. Ten ounces of a crystalline powder that tested positive for meth was pointed out to the police by Valerie. In the pants pocket of a pair of blue jeans found on the floor of the master bedroom were some of the eight marked $100 bills. In the same room in the headboard of the bed in a leather case was a semi-automatic 9mm pistol with a clip; there were also in the room in a case a semi-automatic .22 calibre rifle and an encased high velocity Winchester rifle illegal for hunting. In another room in the house was found a chemical catalogue and a copy of the *Anarchist Cookbook* containing a recipe for the production of meth. Keys to a van were found in the kitchen. A van was parked in a neighboring lot.

On the basis of the same affidavit, a district judge of the county issued a warrant for the search of 3320 Oak Bay Road. The warrant was executed. Jon Lightbourne and Marlene Nowak were arrested in the course of the search. More of the marked buy money was found in Marlene's purse and in Jon's wallet.

On the basis of the evidence obtained at 450 Sentinel Firs Deputy Piccini filed a supplementary affidavit seeking a search warrant for adjoining lots 420 and 430 Sentinel Firs road. On them was found further evidence including the van which the keys fitted. The van was equipped to produce N, N-dimethylamphetamine. With the chemicals present in the van, four to five pounds of the drug could be produced; with the addition of more hydriodic acid the van laboratory could produce two hundred pounds.

On October 11, 1990, Jon and Valerie were charged in superior court with various crimes against the drug laws of Washington. On November 2, 1990, on motion of the state, the charges were dismissed. The drug the Lightbournes possessed was not illegal under the statutes of the state. The Lightbournes then sought the return of property seized during the search of their home. When the county did not respond, the Lightbournes in 1993 filed suit against the county under 42 U.S.C. § 1983. Meanwhile the county had already provided the United States with the information in its possession and the United States had accepted the case for prosecution in 1991. Eventually, the United States charged the three defendants.

## PROCEEDINGS

On February 7, 1995, Jon, Richard, and Valerie were indicted for conspiracy to manufacture and distribute N, N-dimethylamphetamine in violation of § 841(a)(1) and (b)(1)(A) and § 846. The defendants moved to dismiss for vindictive prosecution and for preindictment delay. They also moved to suppress the evidence secured by the search warrants.

Richard and Valerie chose Phil Mahoney, a Seattle attorney, to represent them at trial. Records in this case show him acting as their attorney in the state case against them in 1990 and as their attorney in their civil rights suit against the county. On March 23, 1995, prior to trial in the instant case, the district court sua sponte held a hearing pursuant to Fed.R.Crim.P. 44(c), which provides:

(c) **Joint Representation.** Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take

such measures as may be appropriate to protect each defendant's right to counsel.

The court read the rule to Richard and Valerie, who were accompanied by Phil Mahoney. Asked if Mahoney had been his attorney "through these proceedings," Richard replied, "He sure has." The court inquired of both defendants if they knew that they could have separate counsel. They answered affirmatively. The court repeated this inquiry of Valerie and asked further, "Has anyone, including your husband, put any particular pressure on you to retain Mr. Mahoney as your attorney, as well as your husband's attorney?" Valerie: "No, sir." The Court: "You've done this of your own free and voluntary will?" Valerie: "Yes, sir." The court then asked similar questions and received similar replies from Richard. The court inquired if it was understood that their interests might be different from each other's, and the defendants indicated that they understood. The court asked if they knew that the court would appoint counsel if either one could not afford retained counsel. Again they indicated understanding. The court asked if Mr. Mahoney had told each of them "that both of you are free to hire an attorney of your own free will and if you do not have the money, the court will appoint respective attorneys for each and every one of you?" Each answered, "Yes, Your Honor." The court asked if anything said had led them to change their minds and want separate attorneys. They answered negatively.

At this point, Douglas E. Whalley representing the government asked the court's permission to "point out some possible problems." On being told to proceed, he said:

> I anticipate this case will come back to haunt the court and me on appeal when the defendants realize for the first time difficulties created by joint representation. For example, Mr. Mahoney is unable to discuss with either defendant the possibility of cooperating with the government because if they were to say that, "Yes, I am thinking about cooperating with the government," they would be telling the attorney for codefendant that, and it would put Mr. Mahoney in an impossible position to discuss it with them.

Furthermore, both defendants have a marital privilege. If one would decide during trial that it would be to their advantage to testify, they also would be in the position to testify against their spouse. With separate attorneys and possibly separate trials, if that was a motion made by a separate attorney, they could avoid that conflict. But I can see—I don't question the fact that both of them want Mr. Mahoney to represent them and that at this point the conflicts don't appear to be present, but I can anticipate in trial that there will be conflicts with both the marital privilege and the possibility of cooperation. I don't mean that they are going to cooperate, it's just that they can't even consider negotiating a plea that would impact the codefendant because they have the same attorney.

The court then asked the Lightbournes if these representations had changed their minds in any way. Each replied, "No, sir." The court concluded, "I can't find good cause to believe that there is going to be a conflict. So Mr. Mahoney is both Mr. Lightbourne's attorney and Mrs. Lightbourne's attorney."

On July 20, 1995 the district court conducted a hearing on the defendants' motion to suppress. The motion was denied as were their motions to dismiss for delay and for vindictive prosecution. The first day of trial was August 29, 1995. The case concluded on August 31. The jury retired at 1:50 and returned a verdict of guilty at 5:30.

On November 7, 1995 Phil Mahoney was permitted to withdraw as counsel for Valerie. On December 7, 1995 a sentencing memorandum was filed on her behalf and on December 15, 1995 a sentencing memorandum was filed on behalf of Richard. On December 18, 1995 the court sentenced Richard and Valerie each to six and one-half years imprisonment and three years of supervised release and Jon to five years imprisonment and three years supervised release.

The defendants appeal.

## ANALYSIS

[1] *The Search of 450 Sentinel Firs.* All the defendants' difficulties might be over if

they could suppress the evidence obtained in the search of Richard and Valerie's home. If this search were illegal, then the search of the van came about as the fruit of an illegal search. Most of the evidence becomes inadmissible. Understandably, the defendants attack with vivacity the adequacy of the affidavit supporting the search.

Their principal points are two: There was no showing that Trujillo was truthful about his supplier. There was no showing of the reliability of the CI. Neither singly nor read convergently are these objections persuasive. What the affidavit established beyond cavil was that Trujillo had taken money to get drugs with a promise to return in a quarter of an hour to the buyer and so it was probable that his two stops at 3320 Oak Bay Road and 450 Sentinel Firs had to do with this mission. He had to hand over the money and he had to get the drugs. His truthfulness was not at issue. After he had made his trip he delivered the goods. It was at least probable that he had paid over the money; there was no reason to suppose he had engaged in a charade. Hence it was probable that at one stop he had delivered the money and at the other received the goods. Added to these facts was the observed trip of Jon to 3320 Oak Bay while Trujillo was there. Added to that was Trujillo's disclosure that he was employed by Richard Lightbourne and that his employers furnished him with the drugs—a disclosure confirmed by his visit to Lightbourne's home while on his trip to get the drugs. Added to that were the two tips the police already had that the Lightbournes were in the meth business. The reliability of the CI was sufficiently established for the information he contributed—a former security guard with no criminal history, he merely recorded three observations, that Jon had driven off in the brownish Chevrolet, that Richard was at work, and that Valerie accompanied Trujillo from the house. Nothing in this simple report as a watcher required him to be established as especially knowledgeable or especially trusted. His story confirmed an inference Deputy Piccini had already drawn: Trujillo had driven down the cul-de-sac to make contact with the Lightbournes. Cumulatively the evidence was strong that in the course of carrying out his

drug deal Trujillo had visited his supplier and his supplier's go-between.

[2] *The Search of 3320 Oak Bay.* Jon, the brother of Richard, alone challenges the affidavit as it supports this search. He argues that nothing in the affidavit showed a connection between this address and the suspected crimes. On the contrary, as the foregoing analysis shows, this address was the first place Trujillo went to on his trip to get the drugs and it was the point where he made rendezvous twice, first with Marlene Nowak and Jon, then with Marlene alone. On a short, fast mission to complete a drug deal it was probable that Trujillo would stop twice only for the business at hand. The probability increased in the light of the tips the police already had about Marlene Nowak and about Jon. The probability became even higher when between stops at Nowak's place Trujillo checked in at the Lightbournes, having first had the meeting at Nowak's with Jon. Far more than a hunch supported the reasonable inference that a drug dealer on a mission for drugs was stopping where the drugs would be found or the buy money paid over.

[3] It is almost superfluous to add that reliance on the warrant was additionally protected as good faith reliance on a warrant not deficient on its face, prepared with the assistance of the Jefferson County Prosecutor and the Chief Criminal Deputy Prosecutor of Jefferson County. *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). The sheriff's office, which meticulously monitored the buy with a wire and meticulously maintained surveillance over Trujillo during the course of the buy and meticulously obtained a new warrant for the search of the Lightbournes' property adjoining their home, was equally meticulous in obtaining legal assistance in securing the warrant that sealed the conspirators' conviction.

*The Joint Representation Of Husband And Wife.* Richard and Valerie, neither now represented by Phil Mahoney, and each represented by separate counsel, contend that their constitutional right to effective counsel was denied them when he represented them

both. Each asserts that "an actual conflict of interest" was present and can now be demonstrated and that the conflict likely affected their lawyer's performance adversely. They conclude that they had ineffective assistance. They deny that they validly waived their right to choose effective counsel.

[4] Typically a claim of ineffective assistance is decided on a petition for habeas corpus. As both Richard and Valerie point out in urging reversal on this ground, the claim may be heard on direct appeal if the record is sufficiently complete to allow the appellate court to decide the issue. *United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir.1991). We agree with the appellants that the record is sufficiently complete for us to decide the issue.

[5, 6] The district court complied with Rule 44(c), advising Richard and Valerie of the right to separate counsel for each and determining that each knowingly and freely consented to representation by Phil Mahoney. No conflict appeared. The district court has "substantial latitude" in determining whether to permit or prevent joint representation—a latitude necessary to avoid whipsawing on appeal, with the decision to require new counsel being attacked as denial of the right to choose one's own counsel or the decision to let the choice of one counsel stand being attacked as permitting a conflict. See *Wheat v. United States*, 486 U.S. 153, 161, 163, 108 S.Ct. 1692, 1698, 1699, 100 L.Ed.2d 140 (1988). Here the defendants furnish no grounds for doubting the effectiveness of their waiver of any potential conflict; and no actual conflict is demonstrated.

To demonstrate actual conflict each asserts: "An inherent conflict should be found by virtue of the fact that Mr. and Mrs. Lightbourne are husband and wife." This "inherent conflict," however, is not explained. The defendants move to an apparently distinct point: with a single counsel "the possibility of a negotiated plea immediately became an impossibility." At trial, each says, a new conflict arose when Valerie was examined on the ownership of the jeans found with marked buy money in them. She had told an officer in the search party that the jeans were not hers; at trial she said they were hers and at trial Richard denied that they were his. To this claimed conflict each adds that at trial Richard testified that he rarely entered the area where the drugs and the *Anarchist Cookbook* were found, and the defense asked no questions of Valerie about her use of the area.

These arguments and illustrations fall short. The incidents alleged as conflicts during trial amount to this: Valerie and Richard were consistent in their testimony in a way tending to lessen Richard's culpability. That testimony, given under oath, cannot be blamed on their lawyer. It was their conscious decision to swear that these were the facts. They cannot now come to court and claim, "With different counsel we would have sworn that the facts were different." Separate counsel would not have altered the facts. See *United States v. Crespo de Llano*, 838 F.2d 1006, 1015 (9th Cir.1987).

The decision not to seek a plea bargain was equally deliberate. None was offered them, but, as they were told in open court, there was the possibility that one of them could get a deal at the other's expense. Loyal to each other, they did not want to explore the possibility; they wanted one lawyer to look out for their mutual interests. They cannot now come to court and assert that if they only had different counsel one of them would have dumped the other.

Running through their present allegations of conflict is their initial claim which on first reading seems so abstract and so preposterous: "An inherent conflict should be found by virtue of the fact that Mr. and Mrs. Lightbourne are husband and wife." This claim carries the gender war to its ultimate climax. Not only are men and women hostile to each other; when they are married to each other they are inherently in conflict; a spouse sleeps with the enemy. Rhetoric of this kind, not unknown in modern America, seeks to replace the image of marriage traditionally described in Chief Justice Roger Traynor's words: Marriage is "the center of the personal affections that ennoble and en-

rich human life." *DeBurgh v. DeBurgh*, 39 Cal.2d 858, 864–865, 250 P.2d 598, 601 (1952). Appeal to the rhetoric does not prevail over the common experience that Traynor's words reflect. There was no inherent conflict between husband and wife when as a united couple they faced adversity, even though one could save oneself by sacrificing the other. The marital choice was to stand together. It was not lack of a lawyer but conjugal commitment that decided what must be done. Now, on appeal with separate counsel, they coordinate their strategy as they did at trial.

If any more need be said, it is noteworthy that Phil Mahoney had successfully defeated the state charges; he was fully cognizant of the Lightbournes' affairs; it would have been a real deprivation of their chosen counsel to have forced his ouster or limited him to one client. Moreover, when Valerie at sentencing did have her own counsel she produced no facts lessening her culpability in the conspiracy.

The claimed ineffective assistance of counsel is unsupported.

[7] *The Sentencing Enhancements.* Valerie contends that the pistol on the headboard of her bed was not hers nor used by her. On appeal she makes the almost frivolous contention that the gun was not "foreseeable" by her. It was not merely foreseeable; it was present, ready for use to defend the drugs of the conspirators. Enhancement for its presence was proper.

[8] Valerie argues that the district court failed to make a finding as to the quantity of drugs foreseeable by Valerie as within the scope of the conspiracy and cites *United States v. Petty*, 982 F.2d 1374 (9th Cir.1993), amended 992 F.2d 887, as requiring such a finding. Valerie misreads *Petty*, which speaks to a conspiracy in which participants play different roles and enter the conspiracy at different times. Substantial evidence at trial showed Valerie as a co-participant with Richard in the conspiracy; her participation was not limited as to time. She was properly charged with the amount of drugs that the

chemicals found in the van lab could have produced.

[9] *The Vindictive Prosecution Claim.* Valerie contends that her sentence was increased because she filed the civil suit against the county. She cites these comments of the district court at sentencing:

> Mr. Bauer, the record in this case indicates to this court that if your client—in fact, that argument was made, I think—hadn't, along with her husband, requested a return of property, this case probably never would have been in this court. It sounded like they went to sleep on it and your client called their attention to it. Isn't that sort of arrogance of some kind that defeats what you're saying? ...

> the record reflects that your client would have been home free without that request for return of property.

Valerie draws no connection between these observations and the sentence imposed. These observations state the obvious, that if the Lightbournes hadn't been so persistent about the return of their property, they might have escaped entirely. There is wonder and pity for them bringing ruin upon themselves. But that a citizen's prods and pokes of one government stir a different government's prosecutor to action does not amount to proof of a vindictive prosecution increasing the sentence. See *United States v. Kinsey*, 994 F.2d 699, 702 (9th Cir.1993). The prosecution was conducted, and the punishment was imposed, to sanction the crimes committed by the conspirators.

**AFFIRMED.**